___FILED ___ENTERED
___LODGED ___RECEIVED

DEC - 3 2018

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                      Criminal Action No.: RDB-18-0174

KEVIN CARTER,

Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On March 28, 2018, a federal grand jury returned an indictment against Kevin Carter ("Carter" or "Defendant"), charging him with felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). (Indictment, ECF No. 1.) Currently pending before this Court are the Defendant's Motion to Suppress Statements (ECF No. 19) and Motion to Suppress Evidence (ECF No. 20). The parties' submissions have been reviewed, and this Court held a hearing on the motions on November 28, 2018. For the following reasons, the Defendants' Motions (ECF Nos. 19, 20) are DENIED.

## BACKGROUND

Based on the testimony and exhibits presented at the November 28, 2018 hearing, this Court makes the following findings of fact with respect to this matter. On February 27, 2018, Baltimore City Police Officer Dean Michael McFadden of the District Action Team for the Northwest District of Baltimore was on duty driving a marked patrol vehicle along

1

with Officer Kyle Kruesi.[1] Around 4:30 p.m., the officers were traveling northbound on the 4600 block of Reisterstown Road when they observed an individual wearing two hooded sweatshirts with one hood up. Although it was late February, the temperature was around fifty-four degrees Fahrenheit.

As Officer McFadden drove the marked patrol vehicle past the individual, he looked back and recognized the individual as Kevin Carter, the Defendant. Officer McFadden recognized Carter from "probably around a hundred" interactions he had with him while working in the Northwest District, including when responding to controlled drug substance ("CDS") calls. He recalled that Carter was very confrontational and outspoken during his interactions with police officers, and he had never seen him hide or otherwise evade any police officers.

Officer McFadden testified that when he looked back and recognized Carter, it appeared that Carter made eye contact with him and immediately stopped walking. Carter then went from one yard of a home to another before crouching down behind shrubbery. Interpreting Carter's behavior as attempting to evade the marked patrol vehicle, Officer McFadden pulled the vehicle over to the side of the road. Officer McFadden testified that at this time, Carter was approximately four to six row homes behind the vehicle. He then began backing the vehicle up in order to turn it around and get a better visual of Carter. When Officer McFadden began to move the vehicle, however, he testified that Carter stood up and began sprinting towards an alley. Officer McFadden then turned onto Virginia Avenue and Officer Kruesi exited the vehicle to pursue Carter on foot. At this time, Officer

---

[1] Officer McFadden testified that the purpose of the District Action Team ("DAT") is proactive enforcement for violent and controlled drug substance offenses.

McFadden also turned on his body worn camera to capture video footage and observed Carter running back onto Reisterstown Road.

The Defendant Carter also testified during the motions hearing, and he offered a different account of the events that led to him running down Reisterstown Road. Carter testified that on February 27, 2018, he was taking a walk when he became tired on Reisterstown Road. He then sat down on a nearby stoop and began to look at his phone. He testified that as he was looking at his phone, he heard a noise "in the cut" between row homes behind him. Prior to hearing this noise, he testified that he had not seen any police officers on Reisterstown Road. When he got up to investigate the noise, however, he saw a police officer running towards him. Carter testified that he had never seen a police officer "in the cut" before. Scared and panicked, he then began running away from the officer.

As Carter sprinted southbound, he saw Officer McFadden in the patrol vehicle. Video footage from Officer McFadden's body worn camera shows Officer McFadden identifying his location as "Reisterstown Virginia." While Carter was running down Reisterstown Road, Officer McFadden testified that he observed Carter reach with his hand into the left backside of his waistband, and the video footage indicates Officer McFadden saying "he is reaching." Officer McFadden also activated the patrol vehicle's emergency lights. After Officer McFadden stopped his vehicle in an attempt to block Carter, he exited the vehicle and pursued Carter on foot. As Officer McFadden yelled "come here Carter" and "get on the ground Carter," Carter continued to sprint down Reisterstown Road in and out of traffic. Carter testified that he did not stop running because he was scared for his safety. While the chase continued, Officer McFadden testified that he again saw Carter reach to

3

check his waistband.

When Officer McFadden became close enough to Carter, he shoved him, causing Carter to hit a fence. When Carter hit the fence, a firearm slipped out of his back waistband and hit the ground. At this time, Officer Kruesi caught up to Carter and Officer McFadden and secured the firearm. Subsequently, Carter was arrested.

After the officers arrested Carter, they drove him to the police station. At first the officers and Carter were approached by medical personnel, requested by Officer McFadden because a glass liquor bottle that had also been in Carter's waistband had broken.[2] When Carter refused medical attention, the officers transported Carter to homicide headquarters. Officer McFadden's body worn camera captured statements made during the ride to headquarters, including Officer McFadden asking for Carter's address. When Carter continued to make additional statements and ask questions, Officer McFadden refused to answer and read Carter his *Miranda* rights. Carter verbally acknowledged that he understood his *Miranda* rights.

The Court having seen portions of the video of the interview of Carter, it is clear that prior to beginning the interview, Detective Niedermeier read Carter his *Miranda* rights and gave him a *Miranda* waiver form. Officer McFadden testified that pursuant to Baltimore Police Department practice, prior to initiating an interview officers give suspects a *Miranda* waiver form that lists each individual *Miranda* right. The officers then read aloud each right, ask the individual if he or she understands them, and ask the individual to initial next to each right to confirm their understanding. Pursuant to this policy, Detective Niedermeier read

---

[2] Despite the presence of the liquor bottle, both of the parties agree that Carter was not intoxicated during his interaction with the officers.

4

Carter his rights and Carter acknowledged his understanding by initialing next to each right. (Gov.'s Exh. 4.) Carter did not, however, sign the bottom of the form. (*Id.*)

Throughout the interview, Officer McFadden and Detective Niedermeier were not armed and exhibited a calm demeanor while speaking with Carter. Neither Officer McFadden nor Detective Niedermeier threatened Carter, promised him anything, or offered him anything in exchange for making a statement. Rather, the video recording of the interview shows Carter, unsolicited, telling the officers that he has useful information and that he is willing to share the information if they allow him to go home. The video shows the officers responding by telling Carter that if he wants a deal for exchanging of information, he should speak with an attorney. Moreover, when Carter requested to use a cell phone to call his girlfriend and speak with a detective he knew, the officers permitted him to use his cell phone and brought the detective into the interview room.

One month later, on March 28, 2018, a federal grand jury returned an indictment against Carter, charging him with felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). (Indictment, ECF No. 1.) Subsequently, on July 13, 2018, the Defendant filed the currently pending Motions to Suppress. (ECF Nos. 19, 20.)

## ANALYSIS

### I. Motion to Suppress Evidence

The Defendant Carter moves to suppress the firearm and ammunition seized from him on February 27, 2018 under the Fourth Amendment to the United States Constitution. (ECF No. 19.) Specifically, he argues that being shoved against the fence constituted an arrest for which there was not probable cause. (ECF No. 33.) Alternatively, the Defendant

5

argues that if the shove only constituted an investigatory stop, there was not reasonable articulable suspicion to stop Carter. (*Id.*) In response, the Government argues that the shoving was a stop for which there was reasonable articulable suspicion, and once the firearm dislodged from Carter's person, there was probable cause to arrest him. (ECF No. 25.)

### a. The shove constituted an investigatory stop

In order to determine whether the officers violated Carter's Fourth Amendment rights, this Court must first determine whether shoving Carter against the fence constituted an investigatory stop, requiring only reasonable articulable suspicion under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), or an arrest, requiring probable cause.[3] As the United States Court of Appeals for the Fourth Circuit stated in *United States v. Elston*, 479 F.3d 314 (4th Cir. 2007), "an arrest is defined using an objective standard: whether 'the suspect's freedom of action is curtailed to a degree associated with formal arrest.'" 479 F.3d at 319 (quoting *Park v. Shifflet*, 250 F.3d 843, 850 (4th Cir. 2001)). "A brief but complete restriction of liberty is valid under *Terry*." *Id.* (quoting *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995)).

The Fourth Circuit has held that even the drawing of weapons, handcuffing of a suspect, and placing the suspect in a patrol car for questioning "do[] not necessarily elevate a lawful stop into a custodial arrest." *Elston*, 479 F.3d at 320 (citing *Leshuk*, 65 F.3d at 1109-10); *see also Elston*, 479 F.3d at 321 (holding that the district court did not err by concluding that the suspect's initial detention did not rise to the level of custodial arrest when officers

---

[3] The parties do not dispute that the chase of Carter on Reisterstown Road did not implicate Carter's Fourth Amendment rights because he never acquiesced to police authority. *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868 (1968))).

drew their weapons and placed the suspect in handcuffs); *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2016 WL 1239921, at *5 (D. Md. Mar. 24, 2016), *aff'd sub nom. Peters v. Caplan*, 672 F. App'x 327 (4th Cir. 2017) (finding that officers approaching the suspects with guns drawn, requiring them to lie on the ground, and performing a search did not rise to the level of an arrest).

Here, Officer McFadden suspected that Carter was armed and shoved him to stop him from continuing to run down Reisterstown Road. As soon as Carter hit the fence, the firearm dislodged from his person. Accordingly, the interaction with Carter lasted only as long as to "verify or dispel the officer's suspicion" that Carter was carrying a firearm, and did not curtail Carter's freedom "to a degree associated with formal arrest." *Elston*, 479 F.3d at 320 (citation omitted). Therefore, the initial encounter with Carter was an investigative stop and did not rise to the level of a custodial arrest.[4]

### b. There was reasonable articulable suspicion to stop Carter

Finding that the shove constituted an investigatory stop, the Fourth Amendment permits investigatory stops if an officer has "a reasonable suspicion grounded in specific and articulable facts that the person he stopped has been or is about to be involved in a crime." *United States v. Gross*, No. 12-4983, 537 F. App'x 276 (Aug. 12, 2013) (quoting *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987)). This standard "is not readily, or even usefully,

---

[4] The two cases the Defendant cites include significantly different circumstances than those presented here. *See Park v. Shiflett*, 250 F.3d 843, 852 (4th Cir. 2001) ("Even notwithstanding the fact that the deputies specifically told Mr. Park that he could not leave, it is inconceivable, based on the facts as determined by the trial court, that Mr. Park would have felt free to leave after being thrown against the wall, kicked, handcuffed and locked in the patrol car."); *see also Reid v. State*, 428 Md. 289, 302, 51 A.3d 597, 604 (2012) ("Application of the principles from *Terry* and in the *de facto* arrest cases leads us, with respect to the circumstances in the present case, to determine that a person shot in the back with two metal darts, as was Reid, would reasonably believe that he or she was not free to leave the encounter, especially when, as the trial judge found, a medical technician would have to have removed the prongs.")

reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life." *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) (quoting *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004)). Therefore, when "assessing reasonable suspicion, courts must 'consider the totality of the circumstances' and 'give due weight to common sense judgments reached by officers in light of their experience and training.'" *Id.* (quoting *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004)).

In *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673 (2000), the United States Supreme Court held that presence in a high crime area, unprovoked flight upon noticing police, and nervous, evasive behavior are all relevant factors in determining reasonable suspicion. 528 U.S. at 124; *see also United States v. Mayo*, 361 F.3d 802, 805-06 (4th Cir. 2004) (explaining that "whether the stop occurred in a high crime area" and "whether the suspect engaged in evasive behavior or acted nervously" are relevant factors for reasonable suspicion); *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) ("The Supreme Court has held that the combination of presence in an area known for heavy narcotics trafficking and unprovoked flight upon seeing police arrive was enough to support a reasonable suspicion under *Terry*.").

It is undisputed that when Carter became aware of a police presence, he fled from Officers McFadden and Kruesi. The parties dispute, however, whether Carter's flight was unprovoked, and therefore contributes to the reasonable articulable suspicion analysis, or was provoked by the officers. Although the law regarding provocation "is far from developed," both the Supreme Court and other circuits "have touched on this issue" of what constitutes provoked flight. *United States v. Jeter*, 721 F.3d 746, 753 (6th Cir. 2013) (collecting

cases); *United States v. Rodella*, 804 F.3d 1317, 1325 (10th Cir. 2015). The Sixth, Tenth, and Eleventh Circuits have concluded "that officers cannot improperly provoke—for example, by fraud—a person into fleeing and use the flight to justify a stop." *Jeter*, 721 F.3d at 754; *United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003); *Rodella*, 804 F.3d at 1325. Moreover, "[i]f police officers put a defendant in reasonable fear of physical harm, that might also qualify as provocation." *Jeter*, 721 F.3d at 754; *Rodella*, 804 F.3d at 1326.

With respect to whether Carter's flight was unprovoked, this Court does not find the Defendant's testimony that he was unaware of any police presence until an officer began running towards him "in the cut" credible. Rather, Officer McFadden testified that he observed Carter first see the marked patrol vehicle when he stopped walking abruptly and then walked from one yard of a home to another before crouching down behind shrubbery. Subsequently, Carter began sprinting after Officer McFadden reversed the patrol vehicle towards Carter's direction. This Court also does not find credible Carter's testimony that he ran and continued to run away from the officers because he was scared that if he did not run, he was going to be harassed or beaten. The only concrete instance Carter identified where he was harmed by police in the past was almost twenty years ago in 1999. Since then—despite his testimony that he believed he only has around four prior convictions—Carter has been convicted fourteen times and arrested thirty-six times. (Pre-Plea Criminal History Report, Gov.'s Exh. 8.) On cross-examination, Carter admitted that he has not run away from police officers before each of those arrests. There was also no valid reason to run on February 27, 2018, and this Court makes the factual finding that Carter did not sprint away from Officer McFadden and the marked patrol vehicle because he was in reasonable

fear of physical harm. Accordingly, this Court finds as a matter of fact that his flight was unprovoked.

Considering Carter's unprovoked flight with the remainder of the totality of the circumstances, the officers had reasonable articulable suspicion to stop Carter. When the officers first observed Carter, he was wearing two sweatshirts when the temperature outside was fifty-four degrees Fahrenheit. From armed persons training, Officer McFadden knew that heavy clothing can be used to avoid detection of a firearm within a waistband or otherwise on a person. Officer McFadden also knew that he was patrolling a high crime area. In the past, Officer McFadden had specifically observed Carter in this high crime area when responding to CDS calls. Despite the very confrontational and outspoken nature Carter exhibited in those instances, on February 27, 2018, Carter appeared nervous and evasive by stopping suddenly, changing directions, walking into the yards of vacant homes, and ultimately fleeing. Moreover, Officer McFadden testified that he observed Carter reach into his waistband twice, characteristic of an individual carrying a firearm. This is consistent with Officer McFadden's body worn video showing Officer McFadden saying "he is reaching." Considering the totality of these circumstances—which include Carter's presence in a high crime area, his nervous and evasive behavior before his unprovoked flight, and his reaching into his waistband—and giving due weight to the officers common sense judgments, there was reasonable articulable suspicion to pursue and stop the Defendant on February 27, 2018.

### c. Once the firearm dislodged from Carter's person, there was probable cause to arrest

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*,

462 U.S. 213, 238 (1983). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001). Once Officer McFadden lawfully stopped Carter, a firearm fell from his person. Under Maryland law, barring certain exceptions not applicable here, "a person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person." Md. Code Ann., Crim. Law § 4-203(a)(1). Accordingly, when the officers observed the firearm, they had probable cause to arrest Carter. *See United States v. Broadie*, 238 F.3d 415 (4th Cir. 2000) ("During the suppression hearing, the district court made a credibility determination that part of the firearm was visible above the waistband of [the defendant's] pants, and therefore, the officers had probable cause to arrest [the defendant]."). Accordingly, Defendant's Motion to Suppress Evidence (ECF No. 20) is DENIED.

## II. Motion to Suppress Statements

The Defendant Carter also moves to suppress the statements he made during his interview on February 27, 2018. (ECF No. 19.) He first argues that his statements should be suppressed as the result of his illegal stop and arrest. However, because Carter's stop and arrest complied with the Fourth Amendment, this argument is without merit.[5] Secondarily, the Defendant argues that his statements should be suppressed because they were obtained in violation of his Fifth Amendment rights. Specifically, he argues that because he did not

---

[5] In *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963), the United States Supreme Court articulated the general principle that evidence derived from an illegal arrest or search is deemed fruit of the poisonous tree and is inadmissible, subject to certain exceptions. 371 U.S. at 484-85. Here, this doctrine does not apply because Carter's search and arrest were not in violation of the Fourth Amendment.

11

sign the *Miranda* waiver form, the Government cannot show that he knowingly waived his *Miranda* rights.

*Miranda* warnings are required when a subject is interrogated while in custody. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966); *United States v. Bell*, 901 F.3d 455, 462 (4th Cir. 2018) ("[T]he Supreme Court in *Miranda* adopted a set of procedural rules that apply when a suspect is subjected to custodial interrogation . . . ."). Assuming *Miranda* applies, an individual may nevertheless waive his rights and voluntarily submit to custodial interrogation. To be valid, "[t]he waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice,' and also it must be made 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[6] *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135 (1986)). Courts examine the totality of the circumstances to determine whether a *Miranda* waiver was voluntary, knowing, and intelligent. *United States v. Jones*, No. 17-4340, __ F. App'x __, 2018 WL 4091823 (4th Cir. Aug. 28, 2018).

Carter argues that he did not knowingly waive his *Miranda* rights and continue speaking to the officers during his interview because he did not sign the *Miranda* waiver form. At the outset, it is unclear what specific statements the Defendant seeks to suppress, or whether such statements were in fact elicited by police questioning. Even assuming, however, that the Defendant's statements were made in response to police questioning, his

---

[6] The Defendant does not argue that his statements were involuntary, and to be sure nothing about the interview indicates that his will was "overborne" or his "capacity for self-determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071–72 (4th Cir. 1987). Rather, the video recording of the interview shows all of the officers speaking to Carter in a calm tone and attempting to accommodate his requests, including speaking with his wife and Detective Brown.

12

lack of signature on the *Miranda* waiver form does not vitiate the fact that he acknowledged he understood each of his rights verbally and by initialing next to each one on the *Miranda* waiver form. *See United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) ("A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions." (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)). After acknowledging that he understood his rights, Carter voluntarily continued to speak with the officers, even after they encouraged Carter to consult a defense attorney and reminded him that he could end the interview at any time. Moreover, during the motions hearing Carter testified that on the day he was arrested he was fully aware of what was occurring, understood his *Miranda* rights, and willingly continued to speak with the officers. Accordingly, even assuming *Miranda* applies to the statements offered by Carter on February 27, 2018, he knowingly and voluntarily waived his *Miranda* rights. Therefore, Defendant's Motion to Suppress Statements (ECF No. 19) is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress Statements (ECF No. 19) and Motion to Suppress Evidence (ECF No. 20) are DENIED.

A separate Order follows.

Dated: December 3, 2018

*[signature]*

Richard D. Bennett
United States District Judge